DISTRICT COURT OF APPEAL OF THE STATE OF FLORIDA
FOURTH DISTRICT
*July Term 2014*

**EXOTIC MOTORCARS AND JEWELRY, INC.,**
Appellant,

v.

**ESSEX INSURANCE COMPANY,** A foreign company,
Appellee.

No. 4D13-3937

[November 19, 2014]

Appeal from the Circuit Court for the Fifteenth Judicial Circuit, Palm Beach County; Eli Breger, Judge; L.T. Case No. 502008CA029422MB.

Bambi G. Blum of Bambi G. Blum, P.A., Miami, and Lance W. Shinder of Lance W. Shinder, P.A., Boca Raton, for appellant.

Mitchell L. Shadowitz of Shadowitz Associates, P.A., Boca Raton, for appellee.

MAY, J.

This is the second lap around our Court for Exotic Motorcars, as it appeals an adverse ruling on coverage on its Dealer's Open Lot policy with Essex Insurance Company.[1]  The coverage issue arose from an accident that occurred when Exotic's owner drove a vehicle to another dealership for an inspection and possible servicing.  In its first lap, we held that the subject vehicle, a very expensive Porsche, was a titled vehicle and remanded the case "for the trial court to enter an amended final judgment and to make findings accordingly."  On this lap, Exotic argues the trial court erred in determining that the policy provided no coverage for the Porsche.  We agree and reverse.

---

[1] We previously reversed and remanded the case because the trial court's final judgment after a four-day bench trial "contained no findings of fact, conclusions of law, or other indication of the basis for the trial court's ruling."  *Exotic Motorcars & Jewelry, Inc. v. Essex Ins. Co.*, 111 So. 3d 208, 208–09 (Fla. 4th DCA 2013) (on reh'g).

Exotic obtained the Porsche from a California wholesale dealer and placed the car on its showroom floor. Two days later, a buyer signed a purchase contract with Exotic for the Porsche and left a $5,000 non-refundable deposit. Exotic's owner testified that because Exotic did not allow test drives of their expensive vehicles and had no service department, he drove the Porsche to Champion Motors for the inspection. The accident occurred en route to Champion. The buyer had planned to pick up the Porsche at Champion following the inspection.

After the first appeal, we remanded the case for the trial court to enter an amended final judgment. The issues to be addressed were whether the Porsche was either in "transport" or on a "test drive" at the time of the accident. The trial court entered an amended final judgment in favor of the insurer.

The trial court found that although the vehicle was covered under the policy, the accident was not a covered collision. The court found that the collision did not occur during a "test drive" as that term is commonly understood because "[n]o prospective purchaser was in the vehicle." The court also found that the vehicle was not covered because "transport" means being moved by some method other than driving, and because "an inspection or certification is not a direct purchase." Lastly, the court found that Exotic failed to prove damages even if the vehicle was covered. From this judgment, Exotic has appealed.

Exotic argues on appeal that the trial court gave too narrow an interpretation to the terms "test drive" and "transport", thereby improperly denying coverage under the policy. The insurer responds that the common meaning of "test drive" requires the vehicle to be driven by the potential purchaser, that "transport" and "drive" are not synonymous, and that an inspection is not a "direct sale" under the policy. The insurer further argues that if coverage is found, Exotic failed to prove damages.

We have de novo review of orders interpreting provisions of an insurance policy. *Penzer v. Transp. Ins. Co.*, 29 So. 3d 1000, 1005 (Fla. 2010).

We begin at the beginning with the applicable policy provisions. The relevant part of the policy provides:

PART II – WHERE AND WHEN THIS POLICY COVERS

We cover loss which occurs during the policy period and which occurs:

2

. . . .

1. During a **test drive** of the covered vehicle . . . ;

2. During **transport** of the covered vehicle **for direct purchase or sale** . . . .

(Emphasis altered).

"[W]hen an insurance coverage term is not defined, the term should be given its plain and ordinary meaning." *Barcelona Hotel, LLC v. Nova Cas. Co.*, 57 So. 3d 228, 230–31 (Fla. 3d DCA 2011). Where a policy does not define a term, courts often discern the plain meaning of the term by relying on other sources, such as dictionaries, to determine the accepted meaning of the word. *Id.* at 231.

The Merriam-Webster Dictionary defines "test-drive" as "to drive (a motor vehicle) in order to evaluate performance."[2] The Random House Dictionary defines "test-drive" as "to drive (a vehicle) on the highway or a special track or route in order to evaluate performance and reliability."[3] The Collins English Dictionary defines "test-drive" as "to drive (a car or other motor vehicle) for a limited period of time in order to assess its capabilities and limitations."[4] None of these definitions require a potential purchaser to be driving the car.

Although a potential purchaser could be the driver during a test drive, it could also be a mechanic testing performance after repair, or a car magazine testing a car to write a review on its performance.[5] The term is unambiguous. The plain meaning of "test drive" includes any person driving the car for purposes of evaluating performance.

The insurer suggests that the Oxford Dictionary defines "test drive" as "an act of driving a motor vehicle that one is considering buying in order

---

[2] *Test-Drive Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/test-drive (last visited July 11, 2014).

[3] *Test Drive Definition*, DICTIONARY.COM, http://dictionary.reference.com/browse/test drive (last visited July 11, 2014).

[4] *Id.*

[5] *See, e.g.*, Barry Winfield, *2009 Porsche 911 Carrera & Carrera S Test Drive*, POPULAR MECHANICS (Oct. 1, 2009), http://www.popularmechanics.com/cars/reviews/drives/4270362.

to determine its quality."[6]   This is not the only definition, and at best creates an ambiguity, which is construed against the insurer.  *Swire Pac. Holdings, Inc. v. Zurich Ins. Co.*, 845 So. 2d 161, 165 (Fla. 2003).  While the cases relied upon by the insurer use the term "test drive" in reference to a potential purchaser driving the vehicle, they do not hold that a "test drive" is limited to that circumstance.  *See, e.g., Duncan Auto Realty, Ltd. v. Allstate Ins. Co.,* 754 So. 2d 863, 865 (Fla. 3d DCA 2000); *Snyder v. State,* 362 So. 2d 971, 972 (Fla. 1st DCA 1978).

Here, Exotic's owner testified that he considered his drive to be a "test drive" because "a lot of these cars will sit in garages and they're not very functional."  Because of the rare nature of the vehicles sold by Exotic, potential purchasers are not allowed to take test drives.  Significantly, Exotic does not perform repair service so any issue with the car would have to be determined through a "test drive" by an employee and fixed at another location.

In short, we hold that the term "test drive" includes the circumstances in this case.  The policy therefore provided coverage for the loss.  We reverse the trial court on its interpretation of "test drive" under this policy.  Having reached this conclusion, it is unnecessary for us to address the alternative argument of whether the vehicle was in transport for direct purchase or sale at the time of the accident.

Last, Exotic argues the trial court erred in finding that Exotic failed to prove damages.  We agree.  We have de novo review of this issue.  *Norman v. Padgett*, 125 So. 3d 977, 978 (Fla. 4th DCA 2013).

The policy provides that the insurer will pay the smallest of the following:

1. The dealer's purchase price, plus capital improvements;

2. The actual cash value of the covered vehicle, or the permanently installed equipment if that is all that is damaged or lost;

3. The cost to repair the covered vehicle or its permanently installed equipment with parts of like kind and quality, less any betterment as a result of the repair.  The cost to repair

---

[6]      *Test     Drive     Definition,*     OXFORDDICTIONARIES.COM, http://www.oxforddictionaries.com/us/definition/american_english/test-drive (last visited July 11, 2014).

4

will not include any diminished value as a result of the loss; [or]

4. The limit per covered vehicle on the Declarations Page.

Exotic Motors proved its loss. The purchase price of the Porsche from the California wholesaler was $343,000.[7] The purchaser agreed to buy the Porsche from Exotic for $372,000. The adjuster's report reflected the actual cash value of the Porsche before the accident at $343,000. The report also indicated that replacement parts to fix the vehicle alone would cost around $125,000. This did not include labor. Despite this estimate, the adjuster considered the Porsche "a possible total loss."

To obtain the maximum salvage value, Exotic found a German engineering performance company that would convert the Carrera GT into a Mirage GT, one of only 25 others in the world. The conversion cost was $395,000, plus $28,500 in storage and transportation fees. Exotic obtained a loan, known as a floorplan, on the Porsche for $340,000. The person who loaned the money ultimately "got the vehicle for . . . 340,000."

Given the testimony at trial, Exotic sustained its burden to prove its loss of $343,000. The trial court erred in finding that Exotic failed to prove damages. It proved the Porsche's pre-collision value, both the purchase and sales price, and the cost of the conversion repair. Based on insurer's total-loss determination, Exotic was entitled to the full value of the Porsche prior to the accident less the deductible of $2,500, plus prejudgment interest.

*Reversed and Remanded for entry of judgment for Exotic Motors for $340,500, plus prejudgment interest, and for such further relief as deemed necessary.*

STEVENSON and LEVINE, JJ., concur.

*       *       *

**Not final until disposition of timely filed motion for rehearing.**

---

[7] Exotic had not yet paid the California wholesaler for the Porsche at the time of the accident. Ultimately, Exotic gave the wholesaler two cars—a Lamborghini and a Mercedes Benz—in exchange for the lost Porsche.